AO106(Rev.5/85) Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In the Matter of the Search of
(Name, address or brief description of person, property, or premises to be searched)

| | |
|---|---|
| **xxxxxxxxxx**<br>**Washington, D.C.** | **APPLICATION AND AFFIDAVIT**<br>**FOR SEARCH WARRANT**<br><br>CASE NUMBER: |

(Further described below)

I____Ryan M. Pardee____being duly sworn depose and say:

I am a(n) Special Agent with the Federal Bureau of Investigation and have reason to believe
              (Official Title)

that (name, description and or location) **xxxxxxxxxx, Washington, D.C. is further described as a three story red brick apartment building with tan and off-white siding. The building has cement stairs with green railings leading to the front door. There is a metal and glass call-box to the left of the front door and a green awning with beige numerals "3-3-3-1" in the center of the awning. Apartment G is located on the third floor straight ahead at the top of the stairs with a green door with a gold "G" over the peephole in the door.**

in the District of Columbia, there is now concealed a certain person or property, namely (describe the person or property to be searched)
which is (state one or more bases for search and seizure set forth under Rule 41(c) of the Federal Rules of Criminal Procedure)
 evidence and contraband
See Attachment A hereto and incorporated herein by reference

concerning a violation of Title 21  United States Code, Section(s)841(a)(1) and 846. The facts to support a finding of Probable Cause are as follows:

SEE ATTACHED AFFIDAVIT HEREIN INCORPORATED BY REFERENCE AS IF FULLY RESTATED HEREIN

Continued on the attached sheet and made a part hereof.    ☒ YES    ☒ NO

                                    Signature of Affiant
(202)278-2218                       ,

Sworn to before me, and subscribed in my presence

_____    at _____, Maryland
Date

_____    _____
Name and Title of Judicial Officer    Signature of Judicial Officer

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**Re: Applications for Search Warrants for:**

xxxxxxxxxxxxxxxxxxxxx
**Washington, D.C.**

### AFFIDAVIT

Ryan M. Pardee, Special Agent (SA) with the Federal Bureau of Investigation (FBI), Washington Field Office (WFO), Washington, D.C. (hereinafter "affiant"), being duly sworn, deposes and states as follows:

### BACKGROUND AND EXPERIENCE

1.      Your affiant is "an investigative or law enforcement officer" of the United States within the meaning of Title 18 United States Code Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18 United States Code.

2.      Your affiant has been a Special Agent (SA) with the Federal Bureau of Investigation (FBI) since 2003. Your affiant is currently assigned to Squad CR-3 in the FBI's Washington Field Office (WFO), which is responsible for conducting investigations that target large drug trafficking organizations. From 2003 to present, your affiant has been working on federal narcotics investigations that have led to the arrest and conviction of narcotics dealers. Since 2003, your affiant has received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, search warrant applications, narcotics, money laundering, and various other crimes. In the course of that training and experience, your affiant has become familiar with the

methods and techniques associated with the distribution of narcotics, the laundering of narcotics proceeds, and the organization of narcotics conspiracies. In the course of conducting these investigations, your affiant has been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized electronic surveillance; and preparing and executing search warrants that have led to substantial seizures of narcotics, firearms, and other contraband. Based on your affiant's training, experience and participation in narcotic and drug related investigations, your affiant knows that:

    a. Individuals who deal in illegal controlled substances maintain books, records, receipts, notes, ledgers, bank records, money orders and other papers relating to the importation, manufacture, transportation, ordering, sale and distribution of illegal controlled substances. These books, records, receipts, notes, ledgers, bank records, money orders, etc., are maintained where the dealers in illegal controlled substances have ready access to them, such as in secured locations within their residence, the residences of friends, family members, and associates, or in the places of operation of the drug distribution activity, such as a stash house or safe house or in a vehicle controlled by the trafficker. Moreover, it is common that such records are maintained by traffickers on computers, cellular telephones, PDAs often called "Palm Pilots," and laptop computers and other personal electronic devices.

    b. Individuals who deal in illegal controlled substances routinely conceal in their residences or the residences of friends, family members, and associates, or in the places of operation of the drug distribution activity, such as a stash house or safe house, large quantities of currency, financial

instruments, precious metals, jewelry and other items of value, typically proceeds of illegal controlled substance transactions.

    c. It is common for individuals who deal in the sale and distribution of illegal controlled substances, such as phencyclidine, cocaine and heroin, to secrete contraband related to the activity, such as scales, razors, packaging materials, cutting agents, cooking utensils, buckets, funnels, presses, pots, dishes and other containers for converting cocaine into cocaine base, at their residences, or the residences of friends, family members, or associates, or in the places of operation of the drug distribution activity, such as a stash house or safe house.  Specifically, persons dealing in cocaine base, also known as crack, commonly maintain quantities of cocaine hydrochloride, also known as cocaine powder, because it is a necessary ingredient in the production or manufacture of cocaine base, also known as crack.

    d. Individuals who deal in the sale and distribution of controlled substances commonly maintain addresses and telephone number books or papers which reflect names, addresses and/or telephone numbers for their associates in their illegal organization.  These individuals often utilize cellular telephones, pagers and telephone systems to maintain contact with their associates in their illegal businesses.  These telephone records, bills and pager numbers are often found in their place of residence, or the residence of friends, family members, or associates, or in the places of operation of the drug distribution activity, such as a stash house or safe house or in a vehicle controlled by the trafficker.

    e. Individuals who deal in illegal controlled substances often take photos of themselves, their associates, their property and illegal contraband.  These photos are usually maintained in their place

of residence, or the residences of friends, family members, or associates, or in the places of operation of the drug distribution activity, such as a stash house or safe house.

      f. Persons who traffic controlled substances maintain documents, letters and records relating to illegal activity for long periods of time.  This documentary evidence is usually secreted in their residence, or the residences of friends, family members, or associates, or in the places of operation of the drug distribution activity, such as a stash house or safe house.  This documentary evidence includes but is not limited to telephone numbers, telephone books, address books, credit card and hotel receipts, plane and bus tickets and receipts, car rental receipts, accounts and records in fictitious names, false identification, money orders, cashiers checks relating to cash transactions and records indicating the existence of storage facilities used in narcotics trafficking.

      g. Individuals involved in narcotics trafficking often own, possess and/or use weapons as a means to facilitate their illegal drug activities.  Such weapons are most often secreted in their residence, or the residences of friends, family members, or associates, or in the places of operation of the drug distribution activity, such as a stash house or safe house.

      h. Individuals involved in narcotics trafficking often transport those narcotics to and from transactions in vehicles the trafficker owns or controls.  The transportation of narcotics in such vehicles leaves microscopic evidence of their presence which can be detected by the use of certain scientific procedures.  Moreover, the vehicles used by narcotics traffickers are frequently equipped with hidden compartments used to secrete drugs and weapons.

      3.    Through instruction, training and participation in investigations, your affiant has become familiar with the manner and methods by which narcotics traffickers conduct their illegal business including the laundering of funds generated by illegal narcotics trafficking, and the

language and terms that are used to disguise conversations about their narcotics activities including the laundering of funds generated by illegal narcotics trafficking.  From experience and training, your affiant has learned, among other things, that: (a) in conversations which drug traffickers believe are susceptible to interception, drug traffickers virtually never expressly refer to PCP or other illegal drugs by name; instead, to conceal the true nature of their illegal activities and to thwart detection by law enforcement, they refer to the drugs and drug quantities using seemingly innocent terms; (b) narcotics traffickers frequently use cellular telephones to further their illegal activities by, among other things, remaining in constant or ready communication with one another without restricting either party to a particular location at which they might be the subject of physical surveillance by law enforcement authorities, and because they erroneously believe that interception of cellular communications is impossible or at least more difficult than interception of land-line telephones; and (c) drug traffickers frequently hold meetings or conduct business in their vehicles or those of trusted associates because they believe that the vehicle's mobility and limited size promote the security and privacy of their activities and conversation.

     4.       Your affiant is currently participating in an investigation which targets PCP, heroin and cocaine traffickers operating in the District of Columbia.  The investigation began in November of 2005.  The main targets of this investigation are LONNELL GEORGE GLOVER and ANTHONY MAURICE SUGGS, also known as "APPLEJACK."  Based upon this investigation, as well as your affiant's training and experience, your affiant has reason to believe GLOVER and SUGGS are large-scale narcotics traffickers operating in the metropolitan Washington area.  This investigation has disclosed that GLOVER and SUGGS and their associates have distributed, and continue to distribute heroin, cocaine and PCP.

5.   Beginning on February 9, 2007, the Honorable Rosemary M. Collyer of this Court signed an order authorizing the interception of wire communications over a cellular telephones used by Lonnell George Glover.  With appropriate extensions[1] as required by law, wire communications over that cellular telephone were monitored continuously through at least June 11, 2007.

## II.  LOCATION TO BE SEARCHED

6.   This affidavit is being submitted in support of an application which seeks authorization to search the following location, located in the District of Columbia:

> **xxxxxxxxxxxxxxxxxxxxx Washington, D.C. is further described as a three story red brick apartment building with tan and off-white siding.  The building has cement stairs with green railings leading to the front door.  There is a metal and glass call-box to the left of the front door and a green awning with beige numerals "3-3-3-1" in the center of the awning.  Apartment G is located on the third floor straight ahead at the top of the stairs with a green door with a gold "G" over the peephole in the door.**

## III.  FACTS AND CIRCUMSTANCES

7.   On June 8, 2007, before this Court, your affiant swore to an affidavit in support of requests for search warrants relating to a conspiracy to distribute and possess with intent to distribute phencyclidine (PCP) and heroin involving Lonnell George Glover.  With regard to establishing probable cause that Glover was, until June 12, 2007, conspiring to distribute and possess with intent to distribute PCP and heroin, your affiant requests that the Court rely upon your affiant's aversions therein and incorporate that affidavit herein by reference.  Further, with regard to establishing probable cause that Glover was, until June 12, 2007, conspiring to distribute and possess with intent to distribute PCP and heroin, your affiant notes that on June 12, 2007, a grand jury of this court

---

[1] Judge Collyer signed extensions March 9, 2007, April 5, 2007, May 4, 2007, and June 2, 2007.

returned an Indictment charging, *inter alia*, Glover and other with conspiring to distribute and possess with intent to distribute PCP and heroin.

8.  On April 10, 2007, at 9:04 a.m., Glover received a call on his monitored cellular telephone from an unknown male and the call was intercepted. Glover advised that he would be in Northeast, Washington, D.C., around 9:30 a.m. and offered to meet the unknown male at that time. At 9:37 a.m., Glover received a call on his monitored cellular telephone from the unknown male and the call was intercepted.[2] The unknown male advised that he was by the Checkers on Maryland Avenue and Glover advised that he would be there shortly. The FBI conducted surveillance in the area of 14th Street and Maryland Avenue, Northeast, Washington, D.C. and at 9:45 a.m., Glover was observed with an unknown male walking toward Glover's Chevrolet pick-up truck which was parked in the **xxxxxxxxxx** Street, Northeast, Washington, D.C. When the meeting ended the unknown male got into a Toyota Camry bearing DC tag**xxxxxxxxxx** and left the area.

9.  On May 22, 2007, there were a series of calls between Glover and the unknown male wherein they discuss meeting. However, they never agreed on a definite time or place and at 11:36 p.m., Glover used his monitored cellular telephone to call **xxxxxxxxx**, but the call was answered by voice mail. On May 17, 2007 an Administrative Subpoena was sent to Nuestar seeking subscriber information for telephone number **xxxxxxxxxx**  On May 21, 2007, Nuestar responded to the Administrative Subpoena and advised that the telephone bearing the number **xxxxxxxxxx** is land line subscribed to Mishana Morton, and located at and billed to Mishana Morton at **xxxxxxxxxxxxxxxxxxxx** Washington, D.C.   On May 22, 2007, based on the subscriber

---

Unless otherwise stated the unknown male utilized cellular telephone number (202) 904-4356 to speak to Glover. This is a prepaid cellular telephone and there is no subscriber information available.

information and the prospect of Glover meeting with the unknown male, surveillance was established in the area of 3331 22nd Street, Southeast, Washington, D.C., at 9:45 p.m. At 10:47 p.m., a dark colored car bearing DC tag **Xxxxxxxxx** was observed parked in front of**xxxxxxxxxx**, Washington, D.C.

10. On May 23, 2007, at 9:52 a.m., Glover received a call on his monitored cellular telephone and the call was intercepted. In the beginning of the conversation Glover indicated he had called the unknown male on the "house phone" the previous night around 11:30 p.m. The unknown male explained that he had probably been asleep. Glover and the unknown male had a conversation about the unknown male's unsuccessful attempt to pass the CDL exam. The unknown male then said "Man yesterday I was sitting in front of the um Bank of America, hot as a motherfucker, thirsty as hell." Glover asked the unknown male to give him until 11:00 a.m., and said he would come to the unknown male's location. Based on training and experience in this and other investigations, your affiant knows that PCP is frequently referred to as water, and submits that when the unknown male told Glover yesterday he had been sitting in front of the "Bank of America . . . thirsty as hell," he was informing Glover that he had money and wanted to purchase PCP.

11. On June 6, 2007, at 3:02 p.m., Glover received a call on his monitored cellular telephone from the unknown male and the call was intercepted. The unknown male asked "What you up to?" Glover indicated he was around today and he advised that he was currently in Landover, Maryland. The unknown male then said "Well I'm just gonna go in the house and then you, you know, you come on this side, I'm trying to holler at you." Glover agreed and the call ended. At 7:02 p.m., Glover received a call on his monitored cellular telephone from the unknown male who was using telephone number **xxxxxxxxx** and the call was intercepted. Glover asked the unknown

male to give him until 8:00 p.m.   At 9:24 p.m., Glover received a call on his monitored cellular telephone from the unknown male and the call was intercepted.  Glover advised that he was just getting ready to call the unknown male and asked for his location.  The unknown male responded "I'm like uh fifteen minutes away from my house." Glover then said "Okay, alright, okay I'll come out that way then." At 10:53 p.m., Glover used his monitored cellular telephone to call the unknown male and the call was intercepted.  Glover stated "I'm out front" and the call ended.

## CONCLUSION

Your affiant submits that based upon the facts set out herein there is probable cause to believe that the unknown male is engaged with Glover in the illegal distribution of phencyclidine and resides at <u>xxxxxxxxxxxxxxxxxxxx</u> Washington, D.C.   There is further probable cause to believe based upon the facts set out herein that the unknown male receives phencyclidine in the vicinity of  <u>xxxxxxxxxxxxxxxxxxx</u> Washington, D.C., and there is therefore evidence of his illegal narcotics trafficking as further described in attachment A hereto contained in the premises at <u>xxxxxxxxxxxxxxxxxxx</u> Washington, D.C.

**WHEREFORE** your affiant respectfully requests that a search warrant issue for <u>xxxxxxxxxxxxxxxxxxxx</u> Washington, D.C. authorizing the seizure of evidence as further described in attachent A, attached hereto and incorporated herein by reference.

RYAN M. PARDEE, Special Agent
Federal Bureau of Investigation

SUBSCRIBED TO AND SWORN before me this _____ day of June, 2007.

                                                _____
                                                JOHN M. FACCIOLA
                                                United States Magistrate Judge
                                                  for the District of Columbia

ATTACHMENT A

(a) Books, records, receipts, notes, ledgers, and other papers including any computerized or electronic records, relating to the transportation ordering, purchase and distribution of controlled substances, in particular, cocaine, heroin and phencyclidine (PCP) Schedule I and II controlled substances.

(b) Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers including computerized or electronic address and/or telephone records.

(c) Books, records, receipts, bank statements and records money drafts, letters of credit, money orders and cashier's checks, receipts, passbooks, bank checks, and any other items evidencing the obtaining, secreting, transfer, and/or concealment of assets.

(d) Proceeds of narcotics violations including United States currency, precious metals, jewelry and financial instruments, including but not limited to, stocks and bonds.

(e) Photographs, in particular, photographs of co-conspirators, of assets, of weapons, and/or of controlled substances, and other documents identifying associates and co-conspirators.

(f) Indicia of occupancy, residence and/or ownership of the premises, including but not limited to, utility and telephone bills, canceled envelopes and keys.

(g) Indicia of travel, including, but not limited to, passport, visas, airline tickets, boarding passes, and airline receipts.

(h) Any and all devices used to store and count money such as safes: combinations or lock type, and money counting machines.

(i) Weapons, handguns, and ammunition and any related evidence, such as firearms manuals, original firearms packaging, expended rounds, and gun storage or cleaning materials.

(j) illegal controlled substances, including cocaine, PCP(phencyclidine), and heroin.

(k) Indicia of drug trafficking, including, but not limited to, scales, cutting agents, cutting tools, drug paraphernalia for processing and packaging and/or distributing controlled substances.

(l) Any locked or closed containers believed to contain any of the above listed evidence.